# United States Court of Appeals for the Federal Circuit

———————————

**TAU-KEN TEMIR LLP, JSC NMC TAU-KEN SAMRUK, MINISTRY OF TRADE AND INTEGRATION OF THE REPUBLIC OF KAZAKHSTAN,**
*Plaintiffs-Appellants*

v.

**UNITED STATES, GLOBE SPECIALTY METALS, INC., MISSISSIPPI SILICON LLC,**
*Defendants-Appellees*

———————————

2022-2204

———————————

Appeal from the United States Court of International Trade in No. 1:21-cv-00173-LMG, Senior Judge Leo M. Gordon.

———————————

Decided: August 4, 2025

———————————

PETER JOHN KOENIG, Squire Patton Boggs (US) LLP, Washington, DC, argued for plaintiffs-appellants.

BRENDAN DAVID JORDAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, LOREN MISHA PREHEIM; SHANNI

ALON, United States Department of Commerce, Washington, DC.

JENNIFER MICHELE SMITH-VELUZ, The Bristol Group PLLC, Washington, DC, argued for defendants-appellees Globe Specialty Metals, Inc., Mississippi Silicon LLC. Also represented by ADAM H. GORDON, BENJAMIN JACOB BAY.

_____

Before DYK, PROST, and HUGHES, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* PROST.

Dissenting opinion filed by *Circuit Judge* HUGHES.

PROST, *Circuit Judge*.

Appellants Tau-Ken Temir LLP, JSC NMC Tau-Ken Samruk (individually or collectively, "Tau-Ken"), and Ministry of Trade and Integration of the Republic of Kazakhstan appeal from a final judgment of the U.S. Court of International Trade ("Trade Court"). The Trade Court sustained the U.S. Department of Commerce's ("Commerce") final determination that the Republic of Kazakhstan subsidized Tau-Ken's production of silicon metal in a manner that warranted a countervailable subsidy rate of 160% for the subject merchandise. Commerce reached this determination because it had rejected, as untimely, a Tau-Ken submission that was filed 1 hour and 41 minutes past the deadline. For the reasons below, we vacate the Trade Court's judgment and remand.

## BACKGROUND

### I

### A

On July 20, 2020, Commerce initiated—on the basis of a petition from appellees Globe Specialty Metals, Inc. and Mississippi Silicon LLC (collectively, "petitioners")—an investigation as to whether silicon-metal imports from the

Republic of Kazakhstan benefited from countervailable subsidies provided by that country's government.[1] *Silicon Metal from the Republic of Kazakhstan: Initiation of Countervailing Duty Investigation*, 85 Fed. Reg. 45173, 45175–76 (July 27, 2020) (notice of initiation of countervailing-duty investigation ("CVD investigation") under 19 U.S.C. § 1671a(c)). The CVD investigation named Tau-Ken as a mandatory respondent. *Id.* at 45176. In a CVD investigation, Commerce must make a preliminary determination—usually within 65 days of the investigation's initiation—as to whether countervailable subsidies are being provided. *See* 19 U.S.C. § 1671b(b). Here, that due date was September 23.

Commerce issued an initial questionnaire on July 23. A cover letter accompanying the questionnaire explained that, with limited exceptions, any response must be filed in its entirety by 5:00 p.m. on the relevant date using Commerce's electronic-filing system (ACCESS). J.A. 604–05.

Tau-Ken's response to the affiliate portion of the questionnaire was due August 6. Tau-Ken timely filed its response to that portion. Commerce later issued supplemental questionnaires concerning affiliates, with response due dates of August 18 and September 8. Tau-Ken timely filed its responses to those as well.

Tau-Ken's response to the subsidy portion of the questionnaire—the response relevant here—was due August 31. On August 25, Tau-Ken requested a two-week extension of the deadline—from August 31 to September 14. J.A. 882. In support, it stated that (1) the questionnaire sought "a huge amount of information from many parties," (2) the individuals responding to the questionnaire were

---

[1]  Unless otherwise noted, subsequently referenced dates from the instant Commerce proceeding are in the year 2020, and all times of day refer to Eastern Time.

"new to the process, as the prior individuals doing so ha[d] left," and (3) "COVID[-]19 issues [were] hampering the process." J.A. 882. Two days later, on August 27, Commerce granted a "partial" extension—setting the new deadline as September 10 instead of the requested September 14. J.A. 932.

On September 1, Commerce postponed its preliminary-determination due date by an additional 65 days—from September 23 to November 27. *Silicon Metal from the Republic of Kazakhstan: Postponement of Preliminary Determination in the Countervailing Duty Investigation*, 85 Fed. Reg. 55412, 55412 (Sept. 8, 2020); J.A. 2191; *see* 19 U.S.C. § 1671b(c)(1)(A) (authorizing such a postponement).

Then, on September 9, Tau-Ken requested another extension, this time for one week—from September 10 to 17. This request generally cited the same reasons as the previous one (i.e., the amount of information sought from various entities, the responding individuals' newness to the process as a result of personnel departures, and COVID-19), but it also observed that Commerce had since postponed the preliminary-determination due date. J.A. 1091. That same day, Commerce granted another "partial" extension—setting the new deadline as September 15 instead of the requested September 17. J.A. 1142.

On September 15—the response deadline—Tau-Ken's counsel encountered what he characterized as "technical/computer issues." *See* J.A. 1306. Upon determining that these issues were going to jeopardize a timely filing, he requested, at 3:50 p.m., another extension—this time for one day. J.A. 1306 (representing that counsel had "now received [a] full response but [there] are some technical/computer issues to resolve to file it"; also referencing the prior extension requests as indicating the need for time to answer the questionnaire); J.A. 2418 (representing that counsel filed the one-day-extension request "as soon as it was apparent" that meeting the 5:00 p.m. deadline would not

be possible); *see also* J.A. 1815, 2682–83.  Under Commerce's policy, if a party facing a 5:00 p.m. deadline requests an extension before that time, and—as apparently happened here—Commerce is unable to notify the party of the request's disposition by 5:00 p.m., the deadline is automatically extended until 8:30 a.m. the next business day. *See* J.A. 204 (citing *Extension of Time Limits*, 78 Fed. Reg. 57790, 57792 (Sept. 20, 2013)); *see also Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1088 (Fed. Cir. 2025) (observing that Commerce has stated but not codified this policy).

So, the deadline became September 16 at 8:30 a.m.  At 5:31 a.m. on September 16, Tau-Ken's counsel began the ACCESS filing process.  The response's submission, however, was not completed until 10:11 a.m.—1 hour and 41 minutes past the 8:30 a.m. deadline.

## B

The next day, Tau-Ken's counsel followed up the one-day-extension request by sending Commerce examples of emails that he had received from the ACCESS system, which he said "illustrate[d] technical filing issues" he was facing.   J.A. 1356–58; *see also Tau-Ken Temir LLP v. United States*, 587 F. Supp. 3d 1346, 1353 (Ct. Int'l Trade 2022).

Two weeks later, on October 1, Commerce notified Tau-Ken that it was rejecting Tau-Ken's September 16 submission. J.A. 1712–13.  Commerce observed that, although the deadline was at 8:30 a.m., Tau-Ken's counsel was filing documents through at least 10:10 a.m. *See* J.A. 1712.  Commerce added, "[m]oreover," that Tau-Ken's submission was incomplete because it was "missing the business proprietary [BPI] versions of Exhibits III-A-1 through III-A-8, and

the beginning portion of Exhibit III-A-9." J.A. 1712.[2] Accordingly, because Tau-Ken's response was not filed "in its entirety" by the deadline, Commerce rejected it as "untimely filed." J.A. 1712–13.

Tau-Ken sought reconsideration the next day. In doing so, it expanded on the technical issues that led to the untimely filing, such as "[e]mbedded info [that] ACCESS rejects, file corruption, Russian making searchable PDFs difficult, etc." J.A. 1815. Tau-Ken also explained that it had adhered to Commerce's advice to begin filing no later than 4:00 p.m.—Commerce's "only clear time benchmark given," according to Tau-Ken. J.A. 1815 & n.3 (citing U.S. Dep't of Commerce, ACCESS Handbook on Electronic Filing Procedures, at 16 (Aug. 31, 2020)). Tau-Ken further noted that Commerce "still ha[d] not decided" Tau-Ken's timely filed, September 15 one-day-extension request. J.A. 1816; *see also* J.A. 1817 (arguing that "Commerce had and still has the authority to consider and accept [Tau-Ken's] outstanding, still not decided, timely filed extension request").

Nearly seven weeks later, on November 19, Commerce rejected Tau-Ken's reconsideration request. It reiterated that Tau-Ken's September 16 submission was "incomplete and untimely." J.A. 2139. As to Tau-Ken's one-day-extension request, Commerce explained that it came

---

[2]     The public versions of these exhibits were undisputedly filed. Tau-Ken's counsel has represented, without contradiction, that BPI versions were missing because he inadvertently twice uploaded a JSC NMC Tau-Ken Samruk document instead of the correct Tau-Ken Temir LLP document. *See, e.g.*, *Tau-Ken Temir*, 587 F. Supp. 3d at 1354; J.A. 1921; J.A. 2420. Tau-Ken's counsel has also represented, again without contradiction, that he could quickly supply the correct document. *See* J.A. 1921–22; J.A. 2420.

"approximately one hour before the close of business, too late for Commerce to reply before the deadline." J.A. 2139.

Commerce issued its preliminary determination on November 27. It preliminarily determined that, because of the untimeliness of Tau-Ken's submission (and its resulting rejection and absence from the record), Commerce would (1) resort to "facts otherwise available" in assessing the appropriate countervailable subsidy rate, *see* J.A. 2195 (citing 19 U.S.C. § 1677e(a)(1), (2)(B)–(C)), and (2) apply an inference adverse to Tau-Ken in selecting from the facts otherwise available, *see id.* (citing 19 U.S.C. § 1677e(b)). Applying this adverse inference, Commerce preliminarily determined Tau-Ken's countervailable subsidy rate to be 120%.

## II

Nearly three months later, on February 22, 2021, Commerce issued its final determination.[3] The final determination maintained Commerce's decision to apply an adverse inference when selecting from facts otherwise available, due to Tau-Ken's untimely submission. *See* J.A. 212–16. Applying this adverse inference, Commerce

---

[3] Generally, in a CVD investigation, Commerce must make a final determination within 75 days of its preliminary determination, *see, e.g.*, 19 U.S.C. § 1671d(a)(1), which would have been February 10, 2021. Here, however, Commerce aligned the final-determination due date in this CVD investigation with that in concurrent antidumping investigations, which resulted in a due date of February 22, 2021. *See* J.A. 2193 (citing 19 U.S.C. § 1671d(a)(1) and 19 C.F.R. § 351.210(b)(4)); J.A. 191.

TAU-KEN TEMIR LLP v. US

finally determined Tau-Ken's countervailable subsidy rate to be 160%.[4]

Relevant here, the final determination set forth Commerce's ultimate reasoning for rejecting (and continuing to reject) Tau-Ken's September 16 submission. For example, although Tau-Ken had cited its personnel's newness to the process, COVID-19, and "computer/technical issues," Commerce explained that it had "already granted multiple extensions as a result of these issues." J.A. 205. Commerce also emphasized that, because Tau-Ken filed its one-day-extension request at 3:50 p.m. on the September 15 deadline, Commerce had only limited time "to notice that an extension request had been filed and to affirmatively respond to it." *See* J.A. 205; *see also* J.A. 207 (referencing the "last-minute extension request which we did not have time to evaluate"). And it further faulted Tau-Ken's "experienced" counsel for not attempting to contact the ACCESS help desk or any other Commerce official before the close of business. *See* J.A. 205–06.

In addition to these reasons, Commerce relied heavily on this court's decision in *Dongtai Peak*. *See* J.A. 207–08 (discussing *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343 (Fed. Cir. 2015)). It concluded that the facts here were "very similar to those in *Dongtai Peak*, which set new precedent regarding the acceptance of late submissions." J.A. 207; *see also* J.A. 208 ("Since *Dongtai Peak*, more recent decisions by the [Trade Court] support Commerce's findings in this investigation regarding our

---

[4]   The final rate was higher than the preliminary rate because the final determination found that Tau-Ken benefited from two additional countervailable programs that were not contemplated by the preliminary rate. *See* J.A. 227–29, 243–45.

decision to reject [Tau-Ken's] untimely[ ]filed question-naire response . . . .").

Commerce finally responded to two other issues that Tau-Ken had raised. First, in response to Tau-Ken's argument that Commerce could not reject the September 16 submission simply due to some missing BPI versions of exhibits, Commerce explained that this argument was "moot," J.A. 209, because Commerce was rejecting the submission *solely* because of its belatedness, *see id.* ("Commerce is continuing to base its determination to reject [Tau-Ken's] . . . questionnaire response as untimely based on the lateness of the submission, *rather than the content of the BPI version of the response*." (emphasis added)). Second, in response to Tau-Ken's argument that Commerce still had not decided Tau-Ken's one-day-extension request, Commerce disagreed; it reasoned that the response's rejection itself (and Commerce's explanations for it) "represent[ed] a clear and direct response" to the extension request. J.A. 210.

### III

Tau-Ken sought judicial review at the Trade Court, which sustained Commerce's final determination. *Tau-Ken Temir*, 587 F. Supp. 3d at 1349.

The Trade Court first set forth the applicable regulatory provisions concerning extensions of time and untimely filed responses. *See id.* at 1351–52. As relevant here, unless Commerce is expressly precluded by statute from doing so, it may—for "good cause"—extend a deadline if a party timely files (i.e., files before the deadline) a written extension request stating the reasons therefor. *See* 19 C.F.R. § 351.302(b)–(c).[5] And, unless Commerce so

---

[5] An extension request filed *after* the deadline is considered untimely and "will not be considered unless the

TAU-KEN TEMIR LLP v. US

extends a deadline, it "will not consider or retain in the official record of the proceeding" "[u]ntimely filed factual information, written argument, or other material" that it rejects. *See id.* § 351.302(d)(1)(i); *see also id.* § 351.302(d)(2) (providing that Commerce "will reject such information, argument, or other material . . . with, to the extent practicable, written notice stating the reasons for rejection").

The Trade Court then considered whether Tau-Ken had waived (or forfeited) a challenge to Commerce's denial of Tau-Ken's one-day-extension request by failing to develop an argument regarding the regulatory "good cause" standard in its briefing before that court. *See Tau-Ken Temir*, 587 F. Supp. 3d at 1352. The court assumed, however, that Tau-Ken had combined (1) arguments regarding "good cause" for the one-day-extension request with (2) arguments challenging Commerce's rejection of the September 16 submission. *Id.* at 1353. It therefore treated a challenge to Commerce's denial of the one-day-extension request as preserved.

Relevant to whether Commerce abused its discretion in rejecting the September 16 submission, the Trade Court deemed the parties' "differing interpretations" of *Dongtai Peak* to be at "the core of [their] dispute." *Id.* at 1357. And, after likening this case to *Dongtai Peak* (to Tau-Ken's detriment), the court concluded that Commerce had not abused its discretion in rejecting the submission. *See id.* at 1357–59. The court also sustained Commerce's decision

---

party demonstrates that an extraordinary circumstance exists." *See id.* § 351.302(c). An extraordinary circumstance is an "unexpected event" that "[c]ould not have been prevented if reasonable measures had been taken" and "[p]recludes a party or its representative from timely filing an extension request through all reasonable means." *Id.* § 351.302(c)(2).

to apply an adverse inference when selecting from facts otherwise available, due to Tau-Ken's untimely submission. *See id.* at 1362–64.

Tau-Ken timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

DISCUSSION

We review final decisions of the Trade Court involving a Commerce countervailing-duty determination de novo, reviewing Commerce's determination under the same standard that the Trade Court applied. *See Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 992 F.3d 1348, 1352 (Fed. Cir. 2021).

Under the applicable standard, we will uphold Commerce's rulings unless they are "unsupported by substantial evidence on the record, or . . . otherwise not in accordance with law." *See id.* (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

That said, even in reviewing determinations that, like this one, are covered by the standard of 19 U.S.C. § 1516a(b)(1)(B)(i), we have reviewed Commerce's rejection of submissions as untimely under its own deadlines for abuse of discretion. *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1342 (Fed. Cir. 2021) ("Commerce has discretion to establish and enforce time limits for submitting information . . . ."); *Dongtai Peak*, 777 F.3d at 1353 (concluding that Commerce "reasonably exercised its discretion in rejecting the requests and in enforcing the applicable deadline"); *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (holding that it was "an abuse of discretion" for Commerce to refuse to consider correction of errors "because of the 'untimely' submission of the corrective information"); *see also Oman Fasteners*, 125 F.4th at 1084 (noting that we have applied the review standard of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, to decisions covered by 19 U.S.C.

§ 1516a(b)(1)(B)(i), and that the APA standard provides for setting aside agency decisions that are "an abuse of discretion"). We therefore review Commerce's rejection of Tau-Ken's response as untimely for abuse of discretion.

Our discussion proceeds as follows. First, we address Tau-Ken's preservation of certain arguments. Second, given the influence *Dongtai Peak* had on Commerce and the Trade Court, we separately discuss that opinion. Finally, we articulate and apply considerations for evaluating whether Commerce abused its discretion—and ultimately conclude that it did.

## I

Initially, the government maintains that Tau-Ken forfeited two of its arguments on appeal by failing to preserve them before Commerce or the Trade Court.[6] We agree with the government as to one but not the other.

As to the first, Tau-Ken argues that Commerce erred by not granting the full extent of its earlier extension requests—i.e., those filed August 25 and September 9. Had Commerce done so, Tau-Ken says, the response deadline would have been September 17, which would have made the September 16 submission timely (in this counterfactual scenario). As the government observes, however, Tau-Ken did not challenge Commerce's denials of these extension requests at the Trade Court. We therefore deem this argument forfeited.

As to the second, Tau-Ken argues that Commerce erred by denying its one-day-extension request. The government

---

[6]    Although the government characterizes these arguments as having been "waived," Gov't Br. 14, 18, we understand it to mean "forfeited." *See In re Google Tech. Holdings LLC*, 980 F.3d 858, 862–63 (Fed. Cir. 2020) (explaining the distinction).

contends that Tau-Ken forfeited this argument by not expressly arguing the "good cause" standard of 19 C.F.R. § 351.302(b) to the Trade Court—a failure that, according to the government, means that Tau-Ken is left to challenge *only* Commerce's rejection of its untimely September 16 submission. *See* Gov't Br. 17–19, 23. The government's contention is unconvincing. At the outset, it is not clear that, for purposes of our analysis in this case, there is a meaningful distinction between these two issues—i.e., between whether Commerce should have granted the one-day-extension request (thus rendering the submission timely), or simply accepted the submission despite its untimeliness.[7] But even if we assumed that there is such a distinction, we view Tau-Ken's Trade Court briefing as having fairly developed a challenge to Commerce's denial of the one-day-extension request—despite the scarcity of express mentions of the "good cause" standard. *See, e.g.*, J.A. 2679 (identifying issues such as "Commerce['s] violat[ion] [of] court precedent . . . [and] its own precedent and practice when deciding [Tau-Ken's] extension request"), 2682–84 (explaining the technical issues giving rise to the one-day-extension request), 2686 ("Commerce never says that granting [Tau-Ken's] one-day[-]extension request . . . would have hindered its investigation . . . ."), 2701 (arguing that "Commerce's failure to [grant Tau-Ken's one-day-extension request]" was "an abuse of discretion").

At bottom, we view the issue in this case as whether, under the circumstances—including Tau-Ken's timely

---

[7]    That Commerce never separately explained why it denied the extension request—and instead maintained that its rejection of the submission *itself* (and accompanying explanations) "represent[ed] a clear and direct response" to the request, J.A. 210—casts additional doubt on whether there is any meaningful distinction between these two issues for purposes of our analysis in this case.

filing of its one-day-extension request—Commerce abused its discretion in rejecting Tau-Ken's September 16 submission as untimely.

## II

Commerce and the Trade Court relied heavily on *Dongtai Peak* in rejecting (and sustaining the rejection of) Tau-Ken's September 16 submission. That reliance was misplaced.

In *Dongtai Peak*, Commerce issued the respondent a questionnaire with an April 17 response deadline. 777 F.3d at 1347 (discussing the Supplemental Questionnaire). That deadline passed without a response or extension request from the respondent. It was not until two days later, on April 19, that the respondent filed an extension request—seeking ten more days from the earlier deadline, to April 27. In support of this untimely request, the respondent cited an overlapping deadline for other responses, a national holiday, and issues with its computers. Then, on April 27, the respondent filed another extension request, this time for one day. It ultimately filed its response on April 27 after close of business. *Id.*

Commerce denied the respondent's extension requests and rejected the untimely filed response. It reasoned that the respondent "provided no explanation as to why it was unable to file its extension request in a timely manner prior to the deadline for its questionnaire response." *Id.*

On appeal, we affirmed. We concluded that Commerce "properly found" that the respondent's April 19 extension request "did not demonstrate why [it] was unable to file timely its extension request." *Id.* at 1351. "Indeed, all of the causes of delay noted in [the extension request] were known to [respondent] prior to the April 17[] deadline, and did not prevent [it] from filing an extension request before that date." *Id.* (noting that the respondent was closed for the national holiday from April 5 to 8, the computer

difficulties occurred sometime between April 1 and 4, and the allegedly overlapping deadline was April 9). "Thus, Commerce reasonably determined [that respondent] was entirely capable of at least submitting an extension request on time, but simply failed to do so; therefore, good cause did not exist to retroactively extend the deadline." *Id.* at 1352. Ultimately, we concluded that, "because [respondent] failed to establish good cause with respect to its failure to submit its extension requests in a timely manner, Commerce reasonably exercised its discretion in rejecting the requests and in enforcing the applicable deadline." *Id.* at 1353.

In affirming, we rejected the respondent's various arguments. For example, although the respondent complained that Commerce did not show why the April 19 extension request did *not* establish good cause, we explained that "Commerce was not required to demonstrate good cause for rejecting [respondent's] untimely submissions." *Id.* at 1352; *see also id.* (further explaining that "it is not for [respondent] to establish Commerce's deadlines or to dictate to Commerce whether and when Commerce actually needs the requested information" (cleaned up)). We also confirmed that the respondent's due-process rights had not been violated, because it had notice of the deadline and an opportunity to reply. *See id.* at 1353.

Contrary to some suggestions from Commerce and petitioners in this case, *Dongtai Peak* was not a transformative case in the law of extension requests and untimely submissions. Instead, it was a straightforward application of basic principles and a deferential standard of review to the facts of that case—on an issue whose permissible resolution depends greatly on a case's particular facts.

And here, the facts are quite different from those in *Dongtai Peak*. One important and apparent difference is that, unlike the respondent in *Dongtai Peak*, who filed an untimely extension request (i.e., two days *after* the

deadline), Tau-Ken's one-day-extension request was filed before the deadline and was thus timely.

Accordingly, and as discussed further below, although we are guided by the principles articulated in *Dongtai Peak*, the key factual differences between that case and this one mean that the result in *Dongtai Peak* does not dictate the result here.

### III

### A

"Discretion is abused if, for example, its exercise rests on a clear error of judgment in the consideration of the relevant factors." *Oman Fasteners*, 125 F.4th at 1084 (cleaned up). Therefore, to know whether Commerce abused its discretion in this way, we must know the relevant considerations.

In *Grobest & I–Mei Industrial (Vietnam) Co. v. United States*, the Trade Court articulated and applied—with reference to our case law—considerations it deemed relevant to whether Commerce abused its discretion in rejecting an untimely submission. 815 F. Supp. 2d 1342, 1365–67 (Ct. Int'l Trade 2012). Recognizing that this issue's analysis is "necessarily case specific," the court was "guided first by the remedial, and not punitive, purpose of the antidumping statute and the statute's goal of determining margins 'as accurately as possible.'" *Id.* at 1365 (cleaned up) (first citing *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1103–04 (Fed. Cir. 1990); and then quoting *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).[8] It also considered the "burden imposed upon

---

[8]    Although the Trade Court in *Grobest* was referencing antidumping laws when describing their remedial-not-punitive purpose and noting the goal of determining

[Commerce] by accepting the late submission." *Id.* (quoting *Usinor Sacilor v. United States*, 872 F. Supp. 1000, 1008 (Ct. Int'l Trade 1994)); *see id.* at 1367 (determining that "every indication suggests that the burden of reviewing the [late submission] would not [have been] great" and that "the burden on Commerce [was] not sufficient in this case"). It further considered "the need for finality" at the final stage of the proceeding. *Id.* at 1365 (quoting *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006)); *see also NTN Bearing*, 74 F.3d at 1208 ("In some instances, a tension may arise between finality and [the] correct result."). And, in its analysis, it considered the actions of the late-filing party. The court determined that the party was "diligent" by filing its late submission "promptly upon discovering its error," and the court "credit[ed] these efforts to cooperate" in the proceeding. *Grobest*, 815 F. Supp. 2d at 1367; *see Dongtai Peak*, 777 F.3d at 1351–52 (considering the actions of, and reasons given by, the late-filing respondent in affirming Commerce's determination that "good cause did not exist to retroactively extend the deadline").

We deem the general considerations articulated and applied in *Grobest* sensible and appropriate for evaluating whether Commerce has abused its discretion by rejecting a submission as untimely under its own deadlines. The

_____

margins as accurately as possible, *id.*, countervailing-duty laws have that same purpose and accuracy goal. *See Guangdong Wireking Housewares & Hardware Co. v. United States*, 745 F.3d 1194, 1206 (Fed. Cir. 2014) ("[T]he primary purpose of antidumping and countervailing duties generally is *remedial*, not punitive." (emphasis in original)); *see also Gov't of Que. v. United States*, 105 F.4th 1359, 1370 (Fed. Cir. 2024) (acknowledging "Commerce's statutory obligation to calculate subsidy rates as accurately as possible" (cleaned up)).

government, for its part, agrees that these considerations are relevant to the inquiry.  *See* Oral Arg. at 38:14–39:09.[9] And while petitioners stress that *Grobest* predates our decision in *Dongtai Peak*, Pet'rs' Br. 38, they do not explain why that fact undermines the relevance of these considerations—nor do we think it does, at least for the reasons already discussed above.

Therefore, when evaluating whether Commerce abused its discretion by rejecting a submission as untimely under its own deadlines, relevant considerations generally include: (1) the remedial-not-punitive purpose of the anti-dumping and countervailing-duty laws and the goal of determining margins or rates as accurately as possible; (2) any burden on Commerce in the instant proceeding that would result from accepting the untimely submission; (3) whether any finality concerns would be implicated by accepting the untimely submission; and (4) the late-filing party's efforts (whether as to the untimely submission or throughout the proceeding) and its reasons for the submission's untimeliness.[10]  These considerations are non-exhaustive, and the weight of any individual consideration may vary depending on the circumstances.  But, as a general matter, these considerations provide a useful framework to guide Commerce's use of its discretion and judicial review thereof.

---

[9]    No. 22-2204, https://oralarguments.cafc.uscourts.gov/default.aspx?fl=22-2204_01102025.mp3.

[10]    Relevant to this last consideration is whether, for the untimely submission, the late-filing party *timely* filed an extension request in accordance with 19 C.F.R. § 351.302(c), given the regulation's more exacting "extraordinary circumstance" standard for untimely filed extension requests, *see supra* note 5.

B

Applying these considerations to this case, we conclude that Commerce made a clear error of judgment and thus abused its discretion in rejecting Tau-Ken's September 16 submission.

Initially, there is no dispute that Commerce's rejection significantly impeded its goal of determining a countervailable subsidy rate as accurately as possible. The September 16 submission was Tau-Ken's response to the subsidy portion of the initial questionnaire, which goes to the heart of whether and how Tau-Ken benefitted from countervailable subsidies. *See, e.g.*, J.A. 684–93. Indeed, Commerce freely acknowledged that the September 16 submission "contained vital information." J.A. 208; *see also id.* (noting that the initial questionnaire "requests crucial information regarding the use of subsidy programs under investigation . . . that is used in the calculation of subsidy rates"); J.A. 2195 (Commerce's preliminary determination observing that full questionnaire responses were "necessary to determine the degree to which [Tau-Ken was] provided countervailable subsidies"). By rejecting the September 16 submission, Commerce deprived itself of information that was vital to calculating an accurate rate.

Tau-Ken also argues that accepting the 1-hour-and-41-minute-late September 16 submission would not have burdened Commerce in this CVD investigation or otherwise hindered the investigation's timely completion. In response, the government does not identify any such burden or hindrance; instead, it says that Tau-Ken's position "fails to account for the wide discretion afforded to Commerce in establishing its deadlines and in determining the time in which it needs information." Gov't Br. 26. We agree that Commerce has wide discretion in this regard. But that discretion "has limits." *Goodluck India*, 11 F.4th at 1342. And the government's invocation of generic "wide discretion"

does not advance the inquiry into whether Commerce abused that discretion in *this* case.

Tau-Ken further argues that accepting the September 16 submission would not have implicated any finality concerns, given that September 16 was well before Commerce's February 22, 2021 final determination. The government gives the same response: Commerce has wide discretion. Gov't Br. 26. Again, however, this generic observation is largely unhelpful in resolving the issue in *this* case. And, in any event, we agree with Tau-Ken that no finality concerns would have been implicated by accepting the September 16 submission, because September 16 was more than two months before the preliminary determination and more than five months before the final determination.[11] *See Goodluck India*, 11 F.4th at 1343 (observing that "there are no finality concerns" at a "*preliminary* determination stage" (emphasis in original)); *NTN Bearing Corp.*, 74 F.3d at 1208 (noting that "preliminary determinations are 'preliminary' precisely because they are subject to change," and "[t]hus, the tension between finality and correctness simply did not exist at the time [the party] requested correction").

As to Tau-Ken's efforts in this CVD investigation and its reasons for the submission's untimeliness, the government has its criticisms, which we address below. We note, however, that as to Tau-Ken's efforts: (1) Tau-Ken had timely filed several responses; (2) its September 16 submission was its first missed deadline; (3) Tau-Ken's counsel adhered to the ACCESS handbook's advice not to begin filing after 4:00 p.m.; and (4) Tau-Ken filed its timely extension request soon after its counsel encountered technical issues that seemed to jeopardize a timely filing. And, as to

---

[11] Even if the final-determination due date had remained February 10, 2021, *see supra* note 3, that still would have been almost five months away.

Tau-Ken's reasons for the submission's untimeliness, we note—as the Trade Court has elsewhere observed—that "[n]o one who has confronted issues in using automated filing systems would dispute that unanticipated technical difficulties do sometimes occur." *Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348, 1362 (Ct. Int'l Trade 2022).

## C

The government initially defends Commerce's rejection of the September 16 submission with principles from *Dongtai Peak*. It argues that "Commerce [is] not required to demonstrate good cause for rejecting . . . untimely submissions," *Dongtai Peak*, 777 F.3d at 1352, and that "it is not for [respondent] to establish Commerce's deadlines or to dictate to Commerce whether and when Commerce actually needs the requested information," *id.* (cleaned up). These principles are certainly sound. The extension-seeking party bears the burden to justify its request. *See, e.g.*, 19 C.F.R. § 351.302(b)–(c). And Commerce—not the parties—sets the deadlines; parties cannot unilaterally decide whether and when Commerce actually needs the information it has requested. Yet, sound though these principles are, they do not relieve Commerce of adequately explaining its denial of an extension request or its rejection of an untimely submission when, as here, there are compelling countervailing considerations.

Aside from these basic principles, the government defends Commerce's rejection by criticizing Tau-Ken's efforts and its reasons for the submission's untimeliness. But, given the rejection's significant negative impact on accuracy, the apparent absence of *any* burden that accepting the submission would have imposed on Commerce in this CVD investigation, the lack of any finality implications, and the other circumstances discussed above suggesting legitimate efforts and reasons for the untimeliness, we view

these criticisms as insufficient to justify Commerce's rejection—even under our deferential standard of review.

First, Commerce itself justified the rejection by explaining that Tau-Ken filed its one-day-extension request too late in the day. According to Commerce, because that request came at 3:50 p.m. on the original September 15 due date, "Commerce had just over an hour to notice that an extension request had been filed and to affirmatively respond to it." J.A. 205; *see also* J.A. 207 (similar). But the government concedes that Commerce could have retroactively granted the extension the next day (or sometime thereafter). *See* Gov't Br. 17. We therefore fail to see why Commerce's claimed inability to dispose of the extension request before close of business on September 15 bears materially on whether it should have granted the request or otherwise accepted the untimely submission.

In the same vein, the government likens Tau-Ken's one-day-extension request to the extension request in *Dongtai Peak*. It maintains that here, just as in *Dongtai Peak*, the respondent failed to demonstrate why it could not have filed its request earlier. *See* Gov't Br. 20 (citing *Dongtai Peak*, 777 F.3d at 1351). Yet this argument ignores key factual differences between the two cases. For example, as referenced above, our discussion in *Dongtai Peak* was focused on the extension request's untimeliness—i.e., its having been filed only *after* the deadline. *See* 777 F.3d at 1351–52. We also observed that all of the causes of the delay noted in the extension request were known to the respondent before the deadline "and did not prevent [it] from filing an extension request before that date." *Id.* at 1351. Specifically, in *Dongtai Peak*, the deadline was April 17, the computer difficulties occurred sometime between April 1 and 4, and the previously known holiday and other deadline were between April 5 and 9. *Id.* Here, not only did Tau-Ken timely file its one-day-extension request, but there is also no suggestion that the "technical/computer

issues" it encountered on the deadline were known before then—let alone several days before.

Second, the government argues that Commerce's rejection was justified because Tau-Ken's one-day-extension request was too "vague" as to the "technical/computer issues" it encountered. *E.g.*, Gov't Br. 20–21. This purported justification has several problems. One, Commerce itself did not rely on it. And absent certain exceptions—none of which apply here—we will not uphold an agency's action on a ground that the agency itself did not invoke when it took the action. *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). Two, it is far from clear that, at the time Tau-Ken's counsel filed the one-day-extension request, he even *could* have articulated the precise technical issues he was encountering. Three, even if he could have, it would not have been unreasonable for counsel—facing a rapidly approaching deadline—to prioritize simply trying to file the response over crafting a more robust explanation of those issues in the extension request.[12] Regardless, even setting aside the *Chenery* problem, and even if we assumed that the one-day-extension request both could, and should, have been more granular as to the *precise* technical issues counsel was encountering, the government's quibble on this point cannot reasonably overcome the more

---

[12]  We note that, after the dust settled and the response was submitted on September 16, Tau-Ken provided further information as to the precise nature of these issues. *See, e.g.*, J.A. 1356–58 (follow-up correspondence on September 17 including emails counsel had received from the ACCESS system, which he said "illustrate[d] technical filing issues" he was facing); J.A. 1815 (reconsideration request citing "[e]mbedded info [that] ACCESS rejects, file corruption, Russian making searchable PDFs difficult, etc.").

substantial considerations discussed above favoring accepting the untimely submission.

Third, the government criticizes Tau-Ken's "experienced" counsel for not attempting to contact the ACCESS help desk or any other Commerce official in the midst of the filing difficulties. *See* Gov't Br. 21, 28. This criticism is also insufficient in this case. The government identifies no instruction *requiring* an attempt to contact the ACCESS help desk in the midst of unanticipated filing difficulties—let alone one requiring such an attempt on pain of having an extension request denied. And besides, Tau-Ken *did* timely file an extension request, which presumably reached a relevant Commerce official. On the whole, the government has not adequately explained why any failure to attempt contacting the help desk or another Commerce official in the midst of these unanticipated filing difficulties demonstrates a meaningful lack of effort on Tau-Ken's part, so as to overcome the considerations favoring accepting the untimely submission.

Fourth and finally, the government emphasizes that Tau-Ken had already received "multiple" extensions. *See* Gov't Br. 26–27. Without context, the implication might be that Tau-Ken had previously requested an extension, got all the time it asked for, requested another extension, got all of that time, and so on. But context matters here. Tau-Ken originally asked for two additional weeks—to September 14. Commerce decided to give only ten days—to September 10. Then, as that deadline approached, Tau-Ken asked for an additional week—to September 17. Commerce gave only five days—to September 15. All told, Tau-Ken originally asked for a September 14 deadline, and it ultimately received a September 15 one (setting aside the automatic overnight extension to 8:30 a.m. the next day). So, while it is true that Tau-Ken received "multiple" extensions, under these circumstances, that fact is not particularly suggestive of any persistent dawdling or other lack of effort to comply with deadlines. *Cf. Celik Halat*, 557 F.

Supp. 3d at 1359 (noting, in a similar circumstance, that the respondent had "made repeated, timely extension requests" and that "Commerce was somewhat parsimonious in granting those requests").[13]

Tellingly, when government counsel was pressed at oral argument to justify Commerce's rejection, counsel tended *not* to resort to any of the foregoing criticisms, but instead, to the September 16 submission's incompleteness due to the missing BPI versions of certain exhibits.[14]  Setting aside the strength of this purported justification, it has a more fundamental problem: Commerce expressly declined to rely on it.  *See, e.g.*, J.A. 209 ("Commerce is continuing to base its determination to reject [Tau-Ken's] . . . questionnaire response as untimely based on the lateness of the submission, *rather than the content of the BPI version of the response*." (emphasis added)).  Again, the general rule applies: we will not uphold an agency's action on a ground that the agency itself did not invoke when it took the action.  *See, e.g.*, *Chenery*, 318 U.S. at 87.

---

[13]    In the *Celik Halat* case, Commerce had rejected a submission in its entirety—and, as a result, resorted to facts otherwise available with an adverse inference—because a single exhibit was filed 21 minutes after the deadline.  *Id.* at 1349, 1356.  The Trade Court concluded that "Commerce abused its discretion to impose a draconian penalty upon [respondent] for a minor and inadvertent technical error by its counsel that had no appreciable effect on the . . . investigation."  *Id.* at 1362.

[14]    *See, e.g.*, Oral Arg. at 35:07–31 (Court: "Why isn't it arbitrary to deny them one day?" Counsel: "Because [the response] still wasn't complete . . . ."), 48:35–48 (Court: "How would one day—a one-day extension—prevent Commerce from meeting [its] deadlines?" Counsel: "You may not like this answer, but . . . this comes into the incomplete portion . . . ."); *see also id.* at 39:52–40:01.

\*   \*   \*

In sum, we conclude that Commerce abused its discretion in rejecting Tau-Ken's September 16 submission. Commerce's resort to facts otherwise available and its adverse inference were premised on its rejection of that submission, and the government has not developed any argument in this appeal that some separate, independent basis supports Commerce's resort to facts otherwise available and an adverse inference. We therefore need not, and do not, reach any party's arguments concerning facts otherwise available or an adverse inference.

Accordingly, we vacate the Trade Court's judgment and remand to the Trade Court with instructions to remand to Commerce. On remand to Commerce, Commerce must accept the September 16 submission and proceed with its CVD investigation accordingly. We have every confidence that, on remand, Commerce can obtain the missing BPI versions of exhibits discussed above, with what we expect to be Tau-Ken's ready assistance.

## CONCLUSION

We have considered the government's and petitioners' remaining arguments and find them unpersuasive. For the foregoing reasons, we vacate and remand for further proceedings consistent with this opinion.

## VACATED AND REMANDED

## COSTS

Costs to appellants.

# United States Court of Appeals for the Federal Circuit

---

**TAU-KEN TEMIR LLP, JSC NMC TAU-KEN SAMRUK, MINISTRY OF TRADE AND INTEGRATION OF THE REPUBLIC OF KAZAKHSTAN,**
*Plaintiffs-Appellants*

v.

**UNITED STATES, GLOBE SPECIALTY METALS, INC., MISSISSIPPI SILICON LLC,**
*Defendants-Appellees*

---

2022-2204

---

Appeal from the United States Court of International Trade in No. 1:21-cv-00173-LMG, Senior Judge Leo M. Gordon.

---

HUGHES, *Circuit Judge*, dissenting.

Tau-Ken submitted a late filing after receiving three deadline extensions. Because I believe that Commerce has extensive authority to enforce its own deadlines and that its actions here did not constitute an abuse of discretion, I respectfully dissent.

Commerce works on very tight deadlines; it is statutorily required to make its final determination in an investigation within 140 days of initiating that investigation.

Commerce will normally issue its preliminary results in an investigation within 65 days of publication of the notice of initiation in the Federal Register. 19 U.S.C. § 1671b(b); 19 C.F.R. § 351.205(b)(1). During this time, Commerce may issue questionnaires to any person, including initial and supplemental questionnaires. *See* 19 C.F.R. § 351.301(c)(1). "Initial questionnaire responses are due 30 days from the date of receipt of such questionnaire"; however, "[t]he time limit for response to individual sections of the questionnaire, if the Secretary requests a separate response to such sections, may be less than the 30 days allotted for response to the full questionnaire." 19 C.F.R. § 351.301(c)(1)(i). Issuing the preliminary determination in a timely manner is important so that the parties to the investigation have sufficient time to respond; this gives parties like Tau-Ken *more* due process. Commerce acted very expediently in the present case: it initiated the relevant investigation on July 20, 2020, and issued its initial questionnaire to Tau-Ken three days later, on July 23, 2020.

Parties subject to an investigation are permitted to file requests to extend the deadlines for making submissions to Commerce. The party seeking an extension must file the extension request before the established deadline and state the reasons why there is "good cause" to extend the deadline. 19 C.F.R. § 351.302(b)–(c). Commerce previously granted Tau-Ken two deadline extensions, and Tau-Ken received another automatic 15.5-hour extension by filing its request for a third extension.

As the majority explains, "[w]e . . . review Commerce's rejection of Tau-Ken's response as untimely for abuse of discretion." Maj. Op. 12. "Abuse of discretion will be found when there is an error of law, a clear error of judgment, or findings that were clearly erroneous." *Yancheng Baolong Biochemical Prods. Co. v. United States*, 406 F.3d 1377, 1380 (Fed. Cir. 2005). Commerce did not abuse its discretion or act contrary to law by refusing to wholesale adopt Tau-Ken's subjective view as to how much additional time

was warranted in light of Tau-Ken's newness to the process, COVID, and the volume of information requested. The Supreme Court has provided that "[a]bsent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) (internal quotations and citations omitted). Thus, appellate courts "will defer to the judgment of [the] agency regarding the development of the agency record." *Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1351 (Fed. Cir. 2015) (citations omitted).[1] Specifically, "[i]n order for Commerce to fulfill its mandate to administer" the countervailing duty (CVD) law, "it must be permitted to enforce the time frame provided in its regulations." *Id.* (alteration in original) (citation omitted).

Tau-Ken's argument that Commerce could have still completed its investigation within the timeline defined by regulation if it had fully granted Tau-Ken's first two extension requests ignores the fact that respondents do not dictate whether and when Commerce needs the information it requests. *Id.* at 1352 ("[I]t is not for [the investigated party] to establish Commerce's deadlines or to dictate to Commerce whether and when Commerce actually needs the requested information."). It is of no importance that Commerce's deadline is regulatory and may be pushed;

---

[1] Insofar as Commerce and the Trade Court rely on *Dongtai Peak*, all that case provides is an example of an instance where we found that Commerce did not abuse its discretion by rejecting a response as untimely; *Dongtai Peak* does not define the outer bound for what is required for Commerce to decide to deny an extension without abusing its discretion.

Commerce should not be mandated to push its deadline. Reversing Commerce because it did not make a showing of prejudice as a result of the delay is an improper burden on Commerce's discretion.[2] To place a burden of explanation on Commerce to explain why it will not grant an extension is impractical given the volume of investigations it handles. This case sets a precedent for parties in all future investigations to seek extensions, with the knowledge that Commerce will likely be unable to articulate a reason that withstands the majority's requirements to deny the extension, and effectively gain more time to file a response.

The majority opinion relies on the factors set forth by the Trade Court in *Grobest & I–Mei Industrial (Vietnam) Co. v. United States* to evaluate whether Commerce abused its discretion. Maj. Op. 16–18 (citing 815 F. Supp. 2d 1342, 1365–67 (Ct. Int'l Trade 2012)). In *Grobest*, the Trade Court noted that the analysis of whether Commerce abused its discretion by refusing to accept a late filing "is necessarily case specific." 815 F. Supp. 2d at 1365. In analyzing the circumstances to conclude Commerce had abused its discretion in denying a late filing, the Trade Court found, in relevant part, that investigated party Amanda Foods filed only one late response, and it was diligent in correcting its submission upon discovery of its error. The tardy submission at issue was a separate-rate certification to maintain separate-rate status that Amanda Foods had received in three prior reviews where Amanda Foods had not undergone relevant changes that would affect its status. *Id.* at 1364–65. The Trade Court accordingly found that "the burden on Commerce in considering the late-filed

---

[2]    Insofar as Commerce opted to delay the date of its final determination in this investigation by twelve days to align with concurrent investigations, this does not obligate Commerce to share this extra time with the responding parties.

[separate-rate certification (SRC)] would likely be minimal given that only one SRC was filed late, the late-filed SRC appears to maintain the status quo, and no follow-up was conducted with regard to other separate-rate requests." *Id.* at 1367.

I believe the Trade Court's more recent statement in *Bebitz Flanges Works Private Ltd. v. United States*, is the more apt case for our analysis, since its facts more closely resemble those of the present case. 433 F. Supp. 3d 1309 (Ct. Int'l Trade 2020). In *Bebitz*, the investigated party "challeng[ed] Commerce's decision to not fully grant each of Bebitz's extension requests." *Id.* at 1326. The Trade Court "conclude[d] that Commerce struck the proper balance between finality and accuracy in rejecting Bebitz's untimely submissions and denying some of Bebitz's extension requests in full." *Id.* It noted that Commerce had granted "numerous extensions" and thus "did not deny Bebitz a meaningful opportunity to provide information or remedy deficiencies in its original questionnaires." *Id.* "Given the statutory time constraints imposed upon Commerce and its discretion in imposing time limits for responses, the court . . . agree[d] that Commerce was not obligated to grant Bebitz's full extension requests and did not abuse its discretion in enforcing its own deadlines." *Id.* The Trade Court cited our observation in *Dongtai Peak* that "it is not for [the] [respondent] to establish Commerce's deadlines or to dictate to Commerce whether and when Commerce actually needs the requested information." *Id.* (quoting 777 F.3d at 1352) (second alteration in original). *Bebitz* is more on point both because the conduct of the investigated party's counsel more closely resembles Tau-Ken's counsel's conduct, and because the submissions at issue contained information that Commerce needed to consider in the first instance without the benefit of prior investigations into the matter.

I further note that reasonable minds may vary regarding whether Tau-Ken's counsel acted diligently to upload

its responses after facing technological delays. Though Tau-Ken's counsel received the documents from Tau-Ken that it alleges caused technical difficulties at 10:58 a.m. the morning of the deadline, Tau-Ken's counsel did not file its request for an extension until 3:50 p.m. that day. Even after counsel secured an automatic deadline extension on the evening of September 16 until 8:30 a.m. the next day, they did not even begin to try uploading anything until 5:31 a.m., and did not finish uploading its submission until after 10 a.m. that day. At that point, Tau-Ken's counsel had still not uploaded proprietary documents that were part of its responses. Tau-Ken relies on our statement in *Nippon Steel Corp. v. United States* that filings do "not require perfection and . . . mistakes [can] sometimes occur." 337 F.3d 1373, 1382 (Fed. Cir. 2003). However, the remainder of the quoted sentence captures Tau-Ken's error: this standard "does not condone inattentiveness, carelessness, or inadequate record keeping." *Id.*[3]

Because I believe Commerce has broad authority to enforce its deadlines, and the facts here do not indicate what I would consider to be an abuse of discretion, I respectfully dissent.

---

[3]    Tau-Ken's counsel has been reprimanded at least twice by Commerce in prior proceedings for tardy submissions and requests for extensions, as well as incomplete filings. As a result, Commerce warned in this case that "'from this point forward, all late submissions . . . would be rejected' unless counsel complied with [Commerce's] procedures for requesting extensions." J.A. 1572 (emphasis omitted) (quoting Commerce Senior Director's prior warning to counsel in a different investigation).